

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RECEIVED
MAY 1 3 2008
JUDGE ROBERT W. GETTLEMAN
UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| DEBORAH D. PETERSON, Personal | ) | |
| Representatives of the Estate of James C. | ) | Case No.: 108-cv-01592 |
| Knipple (Dec.), et. al., | ) | |
| | ) | Judge Robert Gettleman |
| Plaintiffs-Judgment Creditors, | ) | Magistrate Judge Martin C. Ashman |
| | ) | |
| vs. | ) | |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, et al., | ) | |
| | ) | |
| Defendants-Judgment Debtors. | ) | |
| | ) | |

FILED

MAY 1 3 2008
May 13 2008
Judge Robert W. Gettleman
United States District Court

## NOTICE OF FILING

TO:    ISLAMIC REPUBLIC OF IRAN acting through its
MINISTRY OF DEFENSE AND SUPPORT FOR ARMED FORCES
No. 1 Shahid Kaboli Street
Beginning of Resalat Highway
Seyyed Khandan Bridge
P.O. Box 16765-1479
Tehran, Iran
Attn: Responsible Officer

ISLAMIC REPUBLIC OF IRAN
Pasadaran Avenue
Golestan Yekom
Teheran, Iran
ATTN: Responsible Officer

ISLAMIC REPUBLIC OF IRAN
Khomeini Avenue
United Nations Street
Teheran, Iran
Attn: Responsible Officer

PLEASE TAKE NOTICE that on the 13th day of May, 2008, Plaintiffs DEBORAH D.

PETERSON, Personal Representatives of the Estate of James C. Knipple (Dec.), et. al., filed

with the Clerk of the Court of the United States District Court, Northern District of Illinois,

Eastern Division, the following:

    1. Motion for Appointment of Receiver Pursuant to F.R.C.P. 66, Local Rule 66.1, and

Pursuant to F.R.C.P. 69(a)(1).

DATED:  May 13, 2008           Plaintiffs, by their attorneys

                                         By:
                                         JAY GLENN, ESQ.

                                       DAVID J. COOK, ESQ.
                                       COOK COLLECTION ATTORNEYS
                                       P.O. Box 270
                                       San Francisco, CA 94104-0270
                                       Telephone: (415) 989-4730
                                       Fax: (415) 989-0491
                                       Email: Cook@Squeezebloodfromturnip.com

F:\USERS\DJCNEW\peterson.appoint3not

**FILED**

MAY 1 3 2008

MaY 13 2008

Judge Robert W. Gettleman
United States District Court

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| DEBORAH D. PETERSON, Personal | ) | |
| Representatives of the Estate of James C. | ) | |
| Knipple (Dec.). et. al.. | ) | |
|  | ) | Case No.: 108-CV-01592 |
| Plaintiffs-Judgment Creditors. | ) | |
|  | ) | Judge Robert Gettleman |
|  | ) | Magistrate Judge Ashman |
| vs. | ) | |
|  | ) | |
| ISLAMIC REPUBLIC OF IRAN. et al., | ) | |
|  | ) | |
| Defendants-Judgment Debtors. | ) | |
|  | ) | |

## DECLARATION OF DAVID J. COOK IN SUPPORT OF MOTION FOR APPOINTMENT OF RECEIVER

I, DAVID J. COOK, hereby declare and state as follows:

1. I am one of the attorneys of record for Plaintiffs in the above-entitled action. am duly authorized to practice before all courts in the State of California, and am familiar with the facts and circumstances in this action.

2. Attached hereto marked *Exhibit "A"* is a true and correct copy of the Affidavit of Matthew W. Stolper. Document No. 11. filed on 6/16/04.

3. Attached hereto marked *Exhibit "B"* is a true and correct copy of a second Affidavit of Matthew W. Stolper. Document No. 199-5, filed on 9/26/06.

4. In his affidavits. Raymond Tindal as senior curator describes in detail at paragraph 5. page 2. the Chogha Mish Collection as "writings and clay fragments that have seal impressions." true and correct copies which are attached hereto marked *Exhibits "C" and "D."*

-5-

5. Iran is the sole party by which to assert its right in and to the collection, as set forth by way of Judge Martin C. Ashman's MEMORANDUM. OPINION AND ORDER. Document No. 123. a true and correct copy which is attached hereto marked *Exhibit "E,"* holding that only Iran can assert its own interest in and to the collections, at least to asserting the FSIA defense.

6. This of course was affirmed by Judge Manning in her MEMORANDUM AND ORDER as Document No. 163. a true and correct copy which is attached hereto marked *Exhibit "F."*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 11, 2008.

/s/ David J. Cook
DAVID J. COOK. ESQ. (SB# 060859)

F:\USERS\DJCNEW\peterson.appoint3

# EXHIBIT "A"

# INDEX OF EXHIBITS

A.    AFFIDAVIT OF MATTHEW W. STOLPER consisting of 7 pages,  Case 1:03-cv-09370  Document 11 Filed 06/16/2004, pages 14 thru 20;

B.    SECOND AFFIDAVIT OF MATTHEW W. STOLPER consisting of 2 pages, Case 1:03-cv-09370 Document 199-5 Filed 09/26/2006;

C.    AFFIDAVIT OF RAYMOND TINDEL consisting of 3 pages, Case 1:03-cv-09370 Document 11 Filed 06/16/2004, pages 11 thru 13;

D.    SECOND AFFIDAVIT OF RAYMOND TINDEL consisting of 2 pages, Case 1:03-cv-09370  Document 199-4, Filed 09/26/2006;

E.    MEMORANDUM OPINION AND ORDER, dated December, 15, 2005, consisting of 17 pages, Case 1:03-cv-09370  Document 123, Filed 12/15/2005;

F.    MEMORANDUM OPINION AND ORDER, dated June 22, 2006, consisting of 13 pages, Case 1"03-cv-09370  Document 163, Filed June 22, 2006.

## EXHIBIT "A"

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(Eastern Division)

JENNY RUBIN, et al.                )
                    Plaintiff,     )
                                   )        Case No.: 03-CV-9370
                                   )        Judge Blanche M. Manning
                                   )
THE ISLAMIC REPUBLIC OF IRAN, et al.   )
                                   )
                    Defendants     )

## AFFIDAVIT OF MATTHEW W. STOLPER

I, Matthew Stolper, declare the following facts under oath and under penalty of perjury:

1.    I am the John A. Wilson Professor of Oriental Studies at the Oriental Institute of The University of Chicago. I teach in the Department of Near Eastern Languages and Civilizations, and am a member of the Committee on the Ancient Mediterranean World. I have been with the Oriental Institute since 1980.

2.    The Oriental Institute is the leading center in the United States for the study of the archaeological and textual record of the development of civilizations in the Ancient Near East, generally treated as including Egypt, North Africa, Israel, Turkey, Syria, Lebanon, Jordan, Mesopotamia and Persia (which include modern day Iraq and Iran). The Institute has existed since 1919 and continuously has occupied the same building on the University of Chicago campus, since 1931.

3.    I am personally familiar with the only two collections of material held by the University of Chicago which involve any ownership claim or interest on the part of any Iranian person or entity, including the Republic of Iran, or any person or entity covered by the phrase "agent of instrumentality" of the Republic of Iran (hereinafter all collectively referred to as "Iran"). Within the Oriental Institute and within the community of scholars that study Persia, those collections are known as (1) the Persepolis Fortification Texts; and (2) the Chogha Mish

- 1 -

Material. I am personally the custodian of the Persepolis Fortification Texts and I am personally familiar with both collections, with their special handling needs, with the security currently applied to them, and with their scholarly value.

4.      The Persepolis texts are not "texts" in a modern sense, in that they are not inscribed upon paper. The collection consists largely of very small clay tablets and even smaller fragments of clay tablets, which were inscribed with cuneiform writings in approximately 500 B.C. They are not stone and do not always break cleanly like stone. To the contrary, they were made by impressing the characters into the moist clay with a stylus; the clay was then allowed to dry and harden in the open air. They were not "fired" or baked in any kind of oven. Created over two thousand years ago from the simple drying of mud-like wet clay, they are now dry, hard, brittle, and always susceptible to being rendered meaningless rubble by mishandling or excessive handling.

5.      The word tablet is misleading as to the average size of these items, which can be estimated at approximately only a few inches in length or width, and less than an inch in thickness, with a very large portion of the collection being clay fragments that are no larger than the size of the end of a human finger.

6.      The cuneiform writing on the dry pieces sometimes must be examined with magnifying lenses. The writing records facts that elucidate the state of civilization in the Ancient World. Like a jigsaw puzzle, the meaning and significance of individual pieces, and the tiny writings on them, are often understood only when one tiny fragment is aligned with another piece which was originally part of a common larger tablet.

7.      The tablets have incalculable scholarly research value as a collection. Collectively, they give insights into one of the most important parts of history, in one of the most

important parts of the world. They uniquely document administrative organization, administrative behavior, and administrative recording of the Achaemenid Persian Empire, which began with Cyrus the Great in 550 B.C. and ended with the conquest of Persia by Alexander the Great and the Greeks in 330 B.C. Most relate to the reign of Darius I, in the 50 year period around 500 B.C. They are also an unparalleled data-set for two ancient languages, Elamite and Old Iranian, and an unparalleled data-set for the art of Archaemenid Persian Empire, art that can only be understood in connection with the contents of the texts. There is no counterpart of equal significance regarding administrative behavior from the Roman world or from any Greek classical state.

8. The Persepolis Texts were recovered by archaeological excavations in 1933, the legitimacy and legality of which have never been questioned or doubted by either the Oriental Institute or any government of Iran. Iran was fully aware of, and was a participant in, the Institute's recovery and transfer of the materials to the United States, in 1936, for further study. At the Institute, they have been studied for decades by a variety of scholars.

9. The Institute has always held the Persepolis Texts in trust for ultimate return to the people of Iran, subject to the Institute's right to define, organize, and study the texts. Neither the Institute nor any Iranian entity has expressed any disagreement or claim over the manner or purpose of the Institute's holding, or over the ultimate return of the Persepolis texts to the Iranian National Museum of Iran and the Iranian Cultural Heritage Organization.

10. Portions of the Persepolis texts have been returned on three occasions to Iran. In 1948, 150 texts (tablet pieces) were returned to Iran for study. In 1951, although the collection size had been originally estimated at 30,000 pieces, some 37,000 fragments from the collection

were returned to Iran for its own study. In 2004, the Institute returned another approximately 300 pieces to Iran.

11. There are no transfers of the Persepolis Fortification Texts now planned or contemplated by the University for any time in the near future—at least for the next six months. *No transfer will be made of this collection without prior court approval during these pending proceedings.*

12. The first significant product of decades of research work on the Persepolis texts was not published until 1969, when Richard T. Hallock published materials that reflected the prior 30 years of study on only 2087 of the texts. Knowledge about the texts in the collection accumulates over time, and not in a simple, linear fashion. A breakthrough regarding one piece or group of pieces can change the prior understanding or significance of any number of other pieces. The total scholarly value of the collection is much greater than the sum of its parts precisely because of the interrelationships among the pieces.

13. Unknown thousands of pieces remain in the collection, subject to continuing study. That study, like that of the last seventy years, could take decades to complete.

14. The material must be handled carefully. It was originally shipped in paraffin that was then melted away upon arrival in the United States in the 1930's. Thousands of cigar-box sized containers have subsequently decayed and been replaced in many cases by new cardboard boxes, by plastic boxes, and by placement of fragments in large metal drawers in cabinets and on shelves which are kept within my personal office at the Institute. To date, although a portion of the collection, totaling approximately 4,500 pieces, have been labeled, numbered and shelved after being carefully cleaned, read and conserved, there still is no comprehensive classification system that currently provides a detailed inventory of the entire collection. The portions of the

- 4 -

collection that have not yet been classified require extensive curatorial work and study before any meaningful classification can be made. On more than one occasion, the Institute has declined to subject the collection to extensive movement and dangerous manipulation that would likely be involved in any expensive and time-consuming effort at total numbering or classification of the pieces. The handling of two-thousand-year-old dried clay should always be minimized, and the Institute has eschewed any unnecessary numbering or coding exercises that would not only deface the objects but also risk their very destruction.

15.      The entire collection is kept under lock and key by me, as the person charged with overseeing the continuing research on the collection. My training, study and research provide me with specialized and highly developed knowledge not only of the historical, cultural and linguistic importance of the collection as a whole, but also of its physical properties and needs. The glass panes in my office door were removed and replaced with a windowless door with double locks approximately ten years ago as a security measure to preserve the collection. Janitors and other personnel who have keys to other areas in the Institute do not have a key to access this collection, as access is reserved to me (or a visiting scholar I can designate as needed), to one of my colleagues who is most active with this collection, and the Security Supervisor of the Institute. In addition to the locks on the office, the entire collection and the rest of the Institute's holdings are held in a heavily alarmed and secured facility that has stored this and other collections without incident for close to a century.

16.      The value and uses of the material are entirely scholarly in nature. They are not the subject of any commercial use whatsoever. The Institute derives no revenue from their use or presence. They have no value of the kind that semi-precious stones have, and their only value to the University is their value as keys to the past.

17. I believe that any collector's concept of value for any of the pieces would be inimical to the value of the collected materials to a research institute that brings together experts in language, history, art, anthropology, and other disciplines to treat the material as a collection and to collectively study its significance and lessons for the study of civilizations. Detaching a single tablet from the group would vastly reduce its value for research purposes, and would, on the whole, add modern damage to the already significant ancient damage the collection has suffered.

18. I make these allegations on my own personal knowledge and in the case of paragraph 16 on my firm belief as a scholar, as well as under penalty of perjury.

Further your affiant sayeth not.


_____

Matthew W. Stolper


SUBSCRIBED and SWORN to
before me this __ day of June, 2004.


_____

Notary Public

CHIDMS1/414181.1

**EXHIBIT "B"**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JENNY RUBIN, *et al.*,

    Plaintiffs - Judgment Creditors,

    v.

THE ISLAMIC REPUBLIC OF IRAN, *et al.*,

    Defendants - Judgment Debtors,

    v.

THE UNIVERSITY OF CHICAGO, *et al.*,

    Citation Third-Party Respondents.

No. 03-CV-9370

Judge Blanche M. Manning

Magistrate Judge Martin C. Ashman

## SECOND AFFIDAVIT OF MATTHEW W. STOLPER

I, Matthew Stolper, declare:

1. As stated in my first Affidavit, filed in this case on June 16, 2004, I am the John A. Wilson Professor of Oriental Studies at the Oriental Institute of The University of Chicago. I teach in the Department of Near Eastern Languages and Civilizations, and am a member of the Program on the Ancient Mediterranean World. I have been with the Oriental Institute since 1980. I am personally familiar with one of the two collections of material held by The University of Chicago which involve any ownership claim or interest on the part of any Iranian person or entity, including the Republic of Iran, or any agency or instrumentality of Iran (collectively "Iran"): the Persepolis Texts loaned to the Oriental Institute. I am personally the custodian of the Persepolis Texts. Iran transferred the Persepolis Texts to the University of Chicago, in or around 1936, for study.

- 1 -

2. The Persepolis Texts have been in the possession and control of the University of Chicago since that time. Portions of the collection have been returned to Iran. I was became responsible for the Persepolis Texts in 1980. Based on my personal knowledge, Iran has made no use whatsoever in the United States of any of the Texts remaining in the possession of the University of Chicago since 1980. I have reviewed documents in the possession of the University relating to the Persepolis Texts. These documents have been produced to the plaintiffs. The documents do not suggest to me that Iran made any use of the objects between 1936 and 1980. I have no information to the contrary. No payments have been made between the University and Iran in connection with the Persepolis Texts at any time.

3. I swear under penalty of perjury that the foregoing is true and correct.

Matthew W. Stolper

Subscribed and Sworn to
Before me this _25_ day of
September, 2006

Notary Public

OFFICIAL SEAL
MARGARET SCHROEDER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES

- 2 -

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(Eastern Division)

JENNY RUBIN, et al.                          )
                         Plaintiff,          )
                                             )        Case No.: 03-CV-9370
                                             )        Judge Blanche M. Manning
THE ISLAMIC REPUBLIC OF IRAN, et al.         )
                                             )
                         Defendants          )

## AFFIDAVIT OF RAYMOND TINDEL

I, Raymond Tindel, declare the following facts under oath and under penalty of perjury:

1.     I am the Registrar and Senior Curator of the Oriental Institute of The University of Chicago. I have been with the Oriental Institute since 1986.

2.     The Oriental Institute is the leading center in the United States for the study of the archaeological and textual record of the development of civilizations in the Ancient Near East, generally treated as including Egypt, North Africa, Israel, Turkey, Syria, Lebanon, Jordan, Mesopotamia and Persia, which include modern day Iraq and Iran. The Institute has existed since 1919 and has occupied the same building, on the University of Chicago campus, since 1931.

3.     I am personally familiar with the only two collections of material held by the Oriental Institute of the University of Chicago which involve any ownership claim or interest on the part of any person or entity related to the Republic of Iran, or to any person or entity that I could include in the phrase "agent of instrumentality" of the Republic of Iran (hereinafter collectively "Iran"). Those collections are well known within the Institute and the community of scholars that study Persia as (1) the Persepolis Fortification Texts; and (2) the Chogha Mish

Material. I am personally the custodian of the Chogha Mish Material, and I am personally familiar with both collections, with their special handling needs, with the security applied to them, and with their scholarly value.

4. The Chogha Mish Material refers to items recovered by excavation at a site in Iran, different from the site that gave rise to the Persepolis Fortification Texts.

5. The Chogha Mish collection includes cuneiform writings and clay fragments that have "seal impressions." These are mud-and-clay based items that appear to have served the same purpose as later day wax seals applied to various objects and bearing various impressions of significance, embedded into the seal that was created by the ball of wet, pliable mud or clay. Like wax, these hardened. Like hardened mud, they are subject to being crumbled back into dirt and dust if mishandled. The characters and very existence of the seals and cuneiform items are the tools of understanding ancient Persian civilization, language, and history.

6. The U.S. State Department previously advised the Institute that the Chogha Mish materials were the subject of litigation before the Iranian Assets Tribunal, and that the dispute ended with an obligation for the U.S. to return the materials, which the State Department would arrange. No instructions for the material have subsequently been received and the Institute holds them for further direction.

7. There is no complete inventory of these two collections and the items are not all numbered or otherwise identified. The Chogha Mish materials are held in a single location within the Institute's high security storage. Janitors and other such personnel have no keys for access, and only the highest members of administration may access the collection. There are no plans to make any transfer of any part of the materials other than to fulfill whatever instructions were to have been forthcoming from the State Department. *As custodian of this collection, I*

- 2 -

represent that it will not be transferred while these proceedings are pending without further order of this court.

8.    The Chogha Mish collection is not displayed or made the subject of any commercial use or activity. It was held only for scholarly research and the only value or use seen by the Institute as appropriate for the collection is as a tool of scholarly research into the development of Near Eastern civilizations.

9.    The Chogha Mish collection is kept separately from the Persepolis Fortification Texts, and one collection can be dealt with, independently of the other.

SWORN TO BEFORE ME and subscribed in my presence this ____ day of June, 2004.

_____
Raymond Tindel

SUBSCRIBED and SWORN to
before me this ___ day of June, 2004.

_____
Notary Public

CHIDMS1/413645.1

- 3 -

# EXHIBIT "D"

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JENNY RUBIN, *et al.*,

      Plaintiffs - Judgment Creditors,

      v.

THE ISLAMIC REPUBLIC OF IRAN, *et al.*,

      Defendants - Judgment Debtors,

      v.

THE UNIVERSITY OF CHICAGO, *et al.*,

      Citation Third-Party Respondents.

No. 03-CV-9370

Judge Blanche M. Manning

Magistrate Judge Martin C. Ashman

## SECOND AFFIDAVIT OF RAYMOND TINDEL

I, Raymond Tindel, declare:

1. As I attested in my first Affidavit, filed in this case on June 16, 2004, I am the Registrar and Senior Curator of the Oriental Institute of The University of Chicago. I have been with the Oriental Institute since 1969. I am personally familiar with the only two collections of material held by Oriental Institute of The University of Chicago which involve any ownership claim or interest on the part of any Iranian person or entity, including the Republic of Iran, or any agency or instrumentality of Iran (collectively "Iran"): 1) the Persepolis Texts loaned to the Oriental Institute, and 2) the Chogha Mish material loaned to the Oriental Institute ("the Chogha Mish Collection"). I am personally the custodian of the Chogha Mish Collection, and I am personally familiar with both collections and activities related to them.

2. The loaned Chogha Mish Collection has been in the possession and control of the University of Chicago since approximately 1965. I was appointed registrar and have been responsible for this collection since 1986. Iran has requested the return of this collection. However, based on my personal knowledge Iran has made no use whatsoever in the United States of the loaned Chogha Mish Collection since 1986. I have reviewed the documents in the possession of the University relating to the Chogha Mish Collection. These documents have been produced to the plaintiffs. The documents do not suggest to me that Iran made any use of these objects in the United States between 1965 and 1986. I have no information to the contrary. No payments have been made between the University and Iran in connection with the Chogha Mish Collection at any time.

3. I swear under penalty of perjury that the foregoing is true and correct.

Raymond Tindel

Subscribed and Sworn to
Before me this 25 day of
September, 2006.

Notary Public

OFFICIAL SEAL
MARGARET SCHROEDER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/29/08

- 2 -

# EXHIBIT "E"



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JENNY RUBIN, et al.,                    )
                                        )
    Plaintiffs,     ) Case No. 03 C 9370
                                        )
    v.              ) Judge Blanche M. Manning
                                        )
THE ISLAMIC REPUBLIC                    ) Magistrate Judge
OF IRAN, et al.,                        )  Martin C. Ashman
                                        )
    Defendants,     )
                                        )
    v.              )
                                        )
THE UNIVERSITY OF CHICAGO,              )
et al.,                                 )
                                        )
    Citation Third Party  )
    Respondents.    )

## MEMORANDUM OPINION AND ORDER

Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, Plaintiffs, Jenny Rubin, Deborah Rubin, Daniel Miller, Abraham Mendelson, Stuart E. Hersch, Renay Frym, Noam Rozenman, Elena Rozenman, and Tvi Rozenman, move this Court for partial summary judgment establishing as a matter of law that no party other than The Islamic Republic of Iran (a/k/a Iran, The Republic of Iran, Republic of Iran, The Government of Iran, Iranian Government, and Imperial Government of Iran), may assert Iran's foreign sovereign immunity defenses under Sections 1609 and 1610 of the Foreign Sovereign Immunity Act, 28 U.S.C. § 1602 et seq. ("FSIA"). Citation respondents, The University of Chicago, Gil Stein, and the Field Museum of Natural History, oppose Plaintiffs' motion. This ruling is needed now so as to define the limits of

discovery in this citation proceeding. This matter comes before this Court pursuant to 28 U.S.C.
§ 636(b)(1)(A) and Local Rule 72.1.


## I.    Background

On July 31, 2001, Plaintiffs brought a personal injury suit against Iran, The Iranian
Ministry of Information and Security, Ayatolla Ali Hoseini Khamenei, Ali Akbar
Hashemi-Rafsanjani, and Ali Fallahian-Khuzestani (collectively "Defendants") in the courts of
the United States. *Campuzano, et al. v. Islamic Republic of Iran, et al.*, 281 F. Supp. 2d 258,
260-61 (D.D.C. 2003). Jurisdiction over these claims was based on the FSIA. *Id.* at 260,
270-71. On September 10, 2003, the United States District Court for the District of Columbia
entered judgments on behalf of Plaintiffs against Defendants. *Id.* at 279.

Attempting to enforce their judgment against Defendant Iran, Plaintiffs seek execution or
attachment of various collections of Persian artifacts currently in the possession of Citation
Respondents.[1] Persian artifacts in Citation Respondents' possession include, but are not limited
to, collections of ancient Persian seal impressions and cuneiform writings found on clay tablets
and tablet fragments known as the Persepolis Fortification Texts and the Chogha Mish collection.
The Persepolis Fortification Texts and the Chogha Mish collection were loaned to Citation
Respondents, in the 1930s and 1960s respectively, to study for philological and archeological
purposes with the understanding that the collections would be returned to Iran when Citation
Respondents' studies were complete.

---

[1] Further background is set forth in this Court's previous opinion, *Rubin v. Islamic Republic of Iran*, 349 F. Supp. 2d 1108 (N.D. Ill. 2004), and familiarity with that opinion is presumed.

Citation Respondents have argued all along that Plaintiffs cannot attach the Persian collections, nor demand discovery based on the collections, until they demonstrate that a commercial activity exception to Section 1609 of the FSIA applies. Initially, Plaintiffs appeared to agree with Citation Respondents and demanded in-depth discovery from Citation Respondents in an effort to determine whether the collections in Citation Respondents' possession were being used for commercial activities. Citation Respondents resisted and, on November 30, 2004, this Court rejected Plaintiffs' discovery demands. In short, this Court held that, under Section 1610(a) of the FSIA, Plaintiffs were not entitled to additional discovery from Citation Respondent University of Chicago because the existence of a commercial activity exception to Section 1609 depends upon the actions of the foreign state, Iran, and not the actions of Citation Respondents. *Rubin v. Islamic Republic of Iran*, 349 F. Supp. 2d 1108, 1111-13 (N.D. Ill. 2004). Significantly, Iran has not been shown to have engaged in commercial activity as to the items in question. On March 18, 2005, Judge Manning overruled Plaintiffs' objections to this Court's ruling. Refusing to be deterred, on August 19, 2005, Plaintiffs shifted their focus from Section 1610(a)'s commercial activity exception to Section 1609's immunity from attachment provision and moved this Court to find that Citation Respondents lack standing to raise Iran's Section 1609 immunity arguments. (Pls.' Mot. Part. Summ. J. at 4.) Iran has been given notice of these proceedings but has not appeared.

- 3 -

## II.    Discussion

### A.    Plaintiffs' Motion For Partial Summary Judgment is Appropriate and Not Time Barred.

Plaintiffs move for partial summary judgment establishing that as a matter of law no party other than Iran may raise Iran's Section 1609 immunity defenses.  Citation Respondents argue that Plaintiffs' motion for partial summary judgment is procedurally improper and that Plaintiffs waited too long to raise the issue of standing.  Specifically, Citation Respondents argue that (1) the courts of the Northern District of Illinois do not issue partial summary judgments, especially where no claims have been filed against the nonmovant, and (2) Plaintiffs waived their standing arguments by not raising them sooner.  (Field Br. at 14; Univ. Chicago Br. at 12-13.)

Partial summary judgment, per Rule 56(d), provides for the situation when judgment is not rendered upon the entire case, but only a potion thereof.  Fed. R. Civ. P. 56(d).  A motion for partial summary judgment that partitions a single claim for relief into constituent parts and then seeks partial summary judgment on some but not all of the constituent parts is not permitted. *Capitol Records, Inc. v. Progress Record Distr., Inc.*, 106 F.R.D. 25, 28 (N.D. Ill. 1985).  Where a party seeks judgment on a complete affirmative defense, however, courts in the Northern District of Illinois routinely entertain motions for partial summary judgment. *Wildey v. Springs*, No. 92 C 8146, 1993 WL 350195, at *1 (N.D. Ill. Sept. 7, 1993). *See also Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, No. 00 C 5658, 2002 WL 1466806, at *12 (N.D. Ill. July 8, 2002); *LCI Intern. Telecom Corp., Inc. v. Am. Teletronics Long Distance, Inc.*, 978 F. Supp. 799, 802 (N.D. Ill. 1997).  Courts in this district have explained Rule 56(d) as follows:

- 4 -

> Although . . . commonly referred to as a "partial summary judgment," it is really
> no more than a pretrial adjudication, interlocutory in character, specifying certain
> issues to be "deemed established" for trial. 6 J. Moore & J. Wicker, *Moore's
> Federal Practice* ¶ 56.20 (2ed. 1948). Its purpose is to "salvage some results from
> the judicial effort involved in the denial of a motion for summary judgment," and
> to "frame and narrow the triable issues if the court finds that such an order would
> be helpful to the progress of the litigation."

*Wildey*, 1993 WL 350195 at *1 (quoting *Lovejoy Elecs., Inc. v. O'Berto*, 616 F. Supp. 1464, 1473

(N.D. Ill. 1985)). Because Plaintiffs' motion addresses a complete affirmative defense raised by

Citation Respondents as a matter of law and does not attempt to partition a single claim for relief

into constituent parts, and because resolution of Plaintiffs' motion promotes judicial economy,

the Court will rule on the merits of the motion.

Plaintiffs did not waive their right to challenge Citation Respondents' standing to raise

Section 1609 and 1610 immunity arguments. As an initial matter, standing is jurisdictional and

not subject to waiver. *Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996); *Perry v. Sheahan*, 222 F.3d

309, 313 (7th Cir. 2000). Next, Plaintiffs did not wait too long to raise their standing challenge,

as the parties are still in the early stages of litigation. *Compare Robinson v. Gov't of Malaysia*,

269 F.3d 133, 146 (2d Cir. 2001) (refusing to entertain arguments raised for first time on appeal).

To date, the parties have litigated a few discovery matters and this Court issued a ruling

interpreting Section 1610(a) as it appeared to relate to the scope of discovery in this case, but that

is all. Furthermore, when Judge Manning overruled Plaintiffs' objections to this Court's ruling

interpreting Section 1610(a), she explicitly stated that this Court's decision on a discovery issue

would not necessarily be the law of this case when it came time to rule on a merits argument.

*Rubin v. Islamic Republic of Iran*, No. 03 C 9370, 2005 WL 783057, at *1 (N.D. Ill. Mar. 18,

2005). Plaintiffs' motion for partial summary judgment now before the Court is just such a merits argument. Finally, Plaintiffs' motion is certainly not estopped as it pertains to Citation Respondent Field Museum, as the Field Museum received their notice of citation to discover assets in March 2005 and have only recently appeared in this case. In short, due to both jurisdictional concerns and the manner in which litigation in this case has proceeded, addressing the standing issue now before the Court is required under the Constitution and is not unduly prejudicial or unfair. Accordingly, Plaintiffs are not barred from filing the motion now before the Court.

B.    **Sections 1609 and 1610 of the FSIA**

Attempting to enforce their judgment against Iran, Plaintiffs seek to attach property of Iran currently in Citation Respondents' possession. Under Rule 69 of the Federal Rules of Civil Procedure, proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, except that any statute of the United States governs to the extent that it is applicable. Fed. R. Civ. P. 69(a). The FSIA is an applicable statute of the United States and is the jurisdictional basis for Plaintiffs' original action. *Campuzano*, 281 F. Supp. 2d at 270-72. Sections 1609 through 1611 of the FSIA deal explicitly with attachment of property in the United States of a foreign state. Sections 1609 and 1610(a)(1) read:

> Section 1609.  Immunity from attachment and execution of property of a foreign state
>
> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign

- 6 -

state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

Section 1610. Exceptions to the immunity from attachment or execution

(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if–
> (1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver . . . .

28 U.S.C. §§ 1609-10. The parties disagree on how to interpret and apply these sections of the FSIA. Plaintiffs claim that only Iran has standing to raise Section 1609 immunity defenses to protect its property because Section 1609 is an affirmative defense personal to Iran. Citation Respondents argue that foreign sovereign immunity in the attachment context is not an affirmative defense and that the Court's subject matter jurisdiction over the property in issue requires the Court to apply Section 1609 regardless of who raises the issue of foreign sovereign immunity. No court in this circuit has addressed the issue of standing under Section 1609 of the FSIA.

### 1.    Summary Judgment Standard

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship*, 209 F.3d 678, 683 (7th Cir. 2000). On summary judgment, the

- 7 -

Court must view the evidence, and draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir. 1992). If taking the record in its entirety cannot lead a rational trier of fact to find for the nonmoving party, then there is no genuine issue for trial and summary judgment must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

2.    Immunity from attachment is an affirmative defense.

Plaintiffs properly characterize Section 1609's immunity from attachment as an affirmative defense. Rule 8(c) of the Federal Rules of Civil Procedure addresses affirmative defenses. Fed. R. Civ. P. 8(c). While immunity is not explicitly listed in Rule 8(c), that list is not intended to be exhaustive. *See* 5 C. Wright & A. Miller, *Federal Practice & Procedure*, §1271 (Supp. 2005). Various forms of immunity have been held by federal courts to be affirmative defenses under Rule 8(c). *See Gomez v. Toledo*, 446 US. 635, 640-41 (1980); *Tritsis v. Backer*, 501 F.2d 1021, 1022-23 (7th Cir. 1974). *See also Ironside v. Simi Valley Hosp.*, 103 F.3d 482, 484 (6th Cir. 1996) ("Immunity is an affirmative defense that pursuant to Rule 8(c) must be pleaded."); *Bentley v. Cleveland County Bd. of County Comm'rs*, 41 F.3d 600, 604 (10th Cir. 1994); 5 C. Wright & A. Miller, *Federal Practice & Procedure*, §1271. Foreign sovereign immunity, while perhaps more politically sensitive than other forms of immunity, was enacted by Congress to be "an affirmative defense which must be specially pleaded." H.R. Rep. No. 94-1487, 9th Cong. 2nd Sess., at 17 (1976). Affirmative defenses may be invoked to avoid liability in a plenary case as well as in a citation hearing. *See F.T.C. v. Nat'l Bus. Consultants,*

- 8 -

*Inc.*, 376 F.3d 317, 322 (5th Cir. 2004); *Liberty Leasing Co. v. Crown Ice Mach. Leasing Co.*, 311 N.E.2d 250, 251-52 (Ill. App. Ct. 1974); *Gregory v. Highway Ins. Co.*, 164 N.E.2d 297, 303-04 (Ill. App. Ct. 1960).

Citation Respondents argue that the plain text of the FSIA makes clear that the immunity from attachment enjoyed by a foreign state is not an affirmative defense. According to Citation Respondents, the attachment provisions of the FSIA focus on the property itself and indicate that such property "shall" be immune unless one of the exceptions enumerated in the statute applies. (Field Br. at 5-6; Univ. Chicago Br. at 3.) In other words, no immunity defenses need to be raised because the property in issue is either exempt or nonexempt. (Field Br. at 3.) Citation Respondents conclude that, before Plaintiffs may attach Iranian property in the United States, Plaintiffs must carry the burden of showing that all the elements of nonexempt property are present, i.e., that the property is not immune from attachment.

Citation Respondents' arguments are flawed. First, Citation Respondents read too much into the words "shall be immune." Congress' use of peremptory language in a given provision is no indication that Congress did not intend that provision to provide an affirmative defense. As Plaintiffs highlight in their brief, peremptory language is often used in conjunction with affirmative defenses. (Pls.' Reply Br. at 3.) For example, various statutes of limitations provisions, including the statute of limitations set out in Section 1605(f) of the FSIA, read, "[n]o action shall be maintained . . . unless . . . ." 28 U.S.C. § 1605(f). *See also* 15 U.S.C. § 1711(a); 18 U.S.C. § 2335(a); 28 U.S.C. § 1350(2)(c); 45 U.S.C. § 56. There is no dispute that statutes of limitations are affirmative defenses that are waived if not timely asserted and can only be asserted by the party affected. Fed. R. Civ. P. 8(c). It follows that peremptory language in

- 9 -

Section 1609 of the FSIA may serve the same purpose of setting out an affirmative defense that will be waived if not timely asserted by an appropriate party.

Next, Citation Respondents' argument that "property" is the grammatical subject of the immunity provision in Section 1609 does not make sense when applied to other instances of peremptory language. According to Citation Respondents' reasoning, if property shall be immune under Section 1609 unless Plaintiffs show that an exception applies, then, in the case of the statutes of limitations discussed above, no action or suit shall be maintained unless Plaintiffs show the statutes of limitations have not run. Thus, Citation Respondents' interpretation creates a presumption that an affirmative defense has been invoked regardless of the parties' pleadings. As discussed above, however, a statute of limitations defense will be waived if not timely raised by the party affected. Fed. R. Civ. P. 8(c). Barring actions or suits because the statute of limitations has run, regardless of whether a party raised that affirmative defense, is simply not the law. It appears, therefore, that Citation Respondents' presumption impermissibly forces this Court to consider affirmative defenses sua sponte and impermissibly forces Plaintiffs to shoulder the burden of disproving affirmative defenses not even raised by Defendant. Because Citation Respondents' reading of Section 1609 appears to reach an absurd conclusion, the Court is not persuaded by it and instead finds that foreign sovereign immunity, as described in Sections 1609 through 1611 of the FSIA, is an affirmative defense.

The Court finds additional support for our interpretation of Section 1609 in Illinois law. Illinois Statute 735 ILCS 5/2-1402(a) governs attachment proceedings in Illinois and states:

> A judgment creditor, or his or her successor in interest when that interest is made to appear of record, is entitled to prosecute supplementary proceedings for the purposes of examining the judgment debtor or any other person *to discover assets*

- 10 -

> *or income of the debtor not exempt* from the enforcement of the judgment, a
> deduction order or garnishment, and of compelling the application of *non-exempt*
> *assets* or income discovered toward the payment of the amount due under the
> judgment.

735 ILCS 5/2-1402(a) (emphasis added). Like Section 1609 of the FSIA, Illinois Statute 735

ILCS 5/2-1402(a) appears grammatically to focus on the property itself when it states that a

judgment creditor is entitled to compel the "non-exempt" assets or income of the debtor toward

the payment of the amount due under the judgment. Id. Under Illinois law, however, exemption

from execution under the statute is a personal privilege to be taken advantage of only by the

execution debtor, and the debtor has the burden of proving the exemption. 19 Ill. Law & Prac.,

Exemptions § 6 (Supp. 2005) (*citing McMasters v. Alsop*, 85 Ill. 157 (1877) and *Burns v. Turner*,

Gen. No. 5941, 1915 WL 2061, at *2 (Ill. App. Ct. Mar. 9, 1915)). Thus, an exemption from

attachment must be affirmatively raised by the judgment debtor, and it is the judgment debtor

who bears the burden of proof. *Burns*, 1915 WL 2061, at *2. Putting this burden on the debtor

makes sense, as the debtor is more likely to know which of his properties qualify for exemptions

and whether he intends to use any of those properties to pay the judgment against him. Thus, the

Court concludes that, like Illinois Statute 735 ILCS 5/2-1402(a), Section 1609 of the FSIA is an

affirmative defense that only the foreign state has standing to invoke.

###    3.    Citation Respondents' case law is not persuasive.

Citation Respondents claim that questions of standing under the FSIA have been

answered by other Courts. Citation Respondents site to *Verlinden B.V. v. Central Bank of*

*Nigeria*, 461 U.S. 480 (1983), and *Walker Int'l Holdings Ltd. v. Republic of Congo*, 395 F.3d 229

- 11 -

(5th Cir. 2004), and argue that standing is not relevant to the Section 1609 analysis. In *Verlinden*, the Supreme Court addressed jurisdiction issues under the FSIA. In *Walker*, the Fifth Circuit Court of Appeals explicitly addressed the issue of standing in the context of Section 1609. These cases are not persuasive, however, and do not affect the Court's ruling.

### a.    *Verlinden B.V. v. Central Bank of Nigeria*

Citation Respondents argue that in *Verlinden*, the Supreme Court found that Section 1609 is not an affirmative defense but rather an issue for the district court to assess sua sponte in order to determine subject matter jurisdiction. In footnote 20 of its decision, the *Verlinden* Court wrote:

> The House Report on the [FSIA] states that "sovereign immunity is an affirmative defense that must be specially pleaded," H.R. Rep. No. 94-1487, at 17. Under the Act, however, subject matter jurisdiction turns on the existence of an exception to foreign sovereign immunity, 28 U.S.C. § 1330(a). Accordingly, even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the Act.

*Verlinden*, 461 U.S. at 493 n.20. Citation Respondents focus on the words "even if the foreign state does not enter an appearance," and claim that the district court is obligated to consider Section 1609 immunity from attachment whether the foreign state raises the issue or not. The Court is not persuaded by this argument, however, as *Verlinden* does not address attachment under Sections 1609 or 1610.

In *Verlinden*, the Supreme Court found that Congress, in enacting the FSIA, did not exceed the scope of Article III of the U.S. Constitution by granting federal courts subject matter jurisdiction over certain civil actions by foreign plaintiffs against foreign sovereigns where the

- 12 -

rule of decision may be provided by state law. *Id.* at 491. The Supreme Court reasoned that a suit against a foreign state under the FSIA necessarily raises questions of substantive law at the very outset and hence clearly arises under federal law, as that term is used in Article III. *Id.* at 492-93. Thus, Sections 1604 though 1607 of the FSIA, which explicitly address jurisdictional immunity, in conjunction with 28 U.S.C. § 1330, conflate subject matter jurisdiction, personal jurisdiction, and the question of sovereign immunity into one inquiry. Because subject matter jurisdiction depends on the outcome of this inquiry, a district court must consider jurisdictional immunity under Section 1604, as well as exceptions to jurisdictional immunity under Section 1605, whether a foreign sovereign is present or not. *Id.* at 493 n.20. *Verlinden's* footnote 20, then, addresses jurisdiction over the foreign state, not the property of the foreign state, and does not answer the standing question now before this Court. Judgement having already been rendered against Iran, the question of plenary subject matter jurisdiction has already been decided.

### b.   *Walker Int'l Holdings Ltd. v. Republic of Congo*

Citation Respondents cite to *Walker* for the proposition that there is nothing in the plain text to suggest that "the sovereign ownership of property must be called to the Court's attention by the foreign state and no one else." (Univ. Chicago Br. at 4.) *Walker* appears to be the only case cited by either party that is precisely on point.[2] In *Walker*, the plaintiff won a judgment

---

[2] In their briefs, Plaintiffs cite to several cases involving attempts by third parties to invoke foreign sovereign immunity (or procedural rights belonging to a foreign sovereign) in the plenary case. *See e.g., Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1290 (11th Cir. 1999) (question of jurisdiction over the foreign sovereign); *Wilmington Trust v.* (continued...)

against the Republic of Congo (ROC) but the ROC refused to pay the judgment. *Walker*, 395

F.3d at 231. The plaintiff then filed a garnishment action against an American company that

owed the ROC money, and moved for a temporary restraining order to prevent the American

company from making payments to the ROC or the ROC's oil company. *Id.* The district court

granted the American company's motions to vacate the temporary restraining order, dissolve the

writs of attachment and garnishment, and dismiss the case. *Id.* On appeal, the plaintiff argued

that the American company lacked standing to invoke Section 1609's immunity from attachment.

*Id.* at 233. The Fifth Circuit rejected the plaintiff's argument and found that:

> [Plaintiff] cites no authority and we were unable to find any authority for the
> proposition that it is the sovereign's *exclusive* right to raise the issue of sovereign
> immunity under the FSIA. In fact, the very language of the FSIA makes clear that
> the [foreign state's] presence is irrelevant: "The property in the United States of a
> foreign state . . . shall not be immune from attachment . . . if (1) the foreign
> state has waived its immunity . . . either explicitly or by implication." 28 U.S.C.
> § 1610(a). The FSIA sets parameters in which property may be attached: "the
> court may order the attachment or execution *only* as 'referred to in subsections (a)
> and (b).'" *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 250 (5th
> Cir. 2002) (emphasis added). Neither 28 U.S.C. § 1610(a) nor (b) requires the
> presence of the foreign sovereign or gives the sovereign exclusive standing to

---

²(...continued)
*United States Dist. Court for Dist. of Hawaii*, 934 F.2d 1026, 1032-33 (9th Cir. 1991) (holding
that only foreign sovereign has standing to assert its right to a bench trial in maritime cases);
*Republic of Philippines v. Marcos*, 806 F.2d 344, 360-61 (2d Cir. 1986) (preliminary injunctions
against former head of state); *Acree v. Republic of Iraq*, 276 F. Supp. 2d 95, 97 (D.D.C. 2003)
*rev'd on other grounds* (attempted intervention on the part of the U.S. Government where foreign
sovereign held to have waived immunity under Section 1605). Because foreign sovereign
immunity in the plenary case involves different procedural and jurisdictional questions than
citation proceedings, Plaintiffs' cases are not relevant to the inquiry now before the Court. For
their part, Citation Respondents cite to *Bayer & Willis Inc. v. Republic of Gambia*, 283 F. Supp.
2d 1 (D.D.C. 2003), where a court permitted a nonsovereign to raise sovereign immunity
defenses in a garnishment proceeding. In *Bayer & Willis*, however, neither the parties nor the
court ever raised the issue of standing, so that decision sheds little light on the case at bar.

- 14 -

raise the waiver element. Hence, we find no merit to [plaintiffs'] standing argument . . . .

*Id.*

This Court is neither bound nor persuaded by the reasoning in *Walker*. First, as discussed above, this Court reads the same statutes as the *Walker* Court but understands immunity from attachment under Sections 1609 and 1610 to be an affirmative defense with limits on when and by whom it may be asserted. Second, finding that a foreign sovereign does not have the exclusive right to raise the issue of foreign sovereign immunity under Sections 1609 and 1610 is problematic, as it allows third parties to interfere with the foreign sovereign's ability to exercise its rights. If, for instance, a foreign sovereign comes before the district court and chooses not to assert Section 1609 immunity from attachment, but fights attachment on other grounds, a citation respondent should not be permitted to do for the foreign sovereign what the sovereign has decided not to do itself. Similarly, a foreign sovereign may prefer to pay a judgment with potentially immune property in order to prevent plaintiffs from attaching other property located in the United States. In such a case, third party interveners should not have standing to prevent the foreign sovereign from exercising its rights. In the case at bar, for example, Iran may prefer that the collections at issue be used to pay the judgment award, as opposed to other of its property.[3] This is a decision that belongs exclusively to Iran as a foreign sovereign and Citation Respondents cannot be permitted to force Iran to make arguments or engage in litigation against its will. For these reasons, the Court remains unconvinced by *Walker*.

---

[3] Iran has chosen to fight Plaintiffs' attachment efforts in Belgium, (Pls.' Notice of Related Proceeding at Exs. A and B), and clearly does not wish to pay the judgment award with the properties in issue there.

- 15 -

4.    Citation Respondents' policy arguments are not persuasive.

Citation Respondents raise several policy arguments in opposition to Plaintiffs' motion.

First, Citation Respondents argue that the Executive Branch of the U.S. Government abhors

attachment of foreign property and consistently argues that third parties have standing to raise

Section 1609 immunity defenses. (Field Br. at 8-10.) Second, Citation Respondents claim that

the history and policy behind the FSIA require this Court to consider Section 1609 sua sponte

and ignore the issue of standing. (Univ. Chicago Br. at 4-7.)

a.    **Executive Branch's interest**

Citation Respondents cite to *Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 16

(D.D.C. 1999), and *Cicippio v. Islamic Republic of Iran*, Civil Action No. 96-1805 (D.D.C.), and

argue that the Executive Branch of the U.S. Government has consistently taken the position that,

under the FSIA, third-party standing is a nonissue and property belonging to a foreign state

should be exempt from execution. (Field Br. at 8-9.) According to Citation Respondents, given

the obligations of the Executive Branch to administer United States foreign policy, *see Am. Ins.*

*Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003), the Executive Branch's consistent position on the

FSIA should be given great weight by the Court. The Court, however, fails to discern a clear

desire by the Executive Branch to prevent attachment of the property of foreign states.

In *Flatow*, the U.S. Government argued that, under Section 1609 and 1610 of the FSIA,

the district court lacked jurisdiction over certain Iranian properties, despite the fact that Section

1609 and 1610 immunity defenses had been raised by a non-agent third party. *Flatow*, 76

F. Supp. 2d at 20, 23. The non-agent third party in *Flatow*, however, was the U.S. Government

- 16 -

itself, which had standing to assert FSIA defenses because it took custody of and leased the Iranian properties in issue against Iran's wishes but pursuant to the Foreign Missions Act, 22 U.S.C. § 4305(c).[4]  *Id.* at 21.  Not surprisingly, the *Flatow* Court found that, "although leasing of property by a private party might be commercial in nature, taking custody over diplomatic property under the authority granted by a federal statute or treaty is decidedly sovereign in nature."  *Id.* at 23.  Thus, the U.S. Government's filings in *Flatow* do not truly address third-party standing to assert Section 1609 immunity defenses, nor the Executive Branch's position on attaching the property in the United States of a foreign state.

In *Cicippio*, the plaintiffs won a judgment against Iran, 18 F. Supp. 2d 62, 70 (D.D.C. 1998), and then sought to attach certain Iranian bank accounts held by Bank of America. *Cicippio*, Civil Action No. 96-1805 (D.D.C.)  The U.S. Government filed a brief with the District Court for the District of Columbia on August 16, 2000, arguing that the Bank of America accounts were exempt from attachment because: (1) the accounts were blocked or frozen pursuant to Executive Order 12170 and its implementing regulations, the Iranian Assets Control Regulations, 31 C.F.R. § 535.201 (which expressly prohibits attachment of blocked funds); (2) the accounts were being maintained in accordance with United States obligations under the Vienna Conventions on Diplomatic and Consular Relations; (3) the original funds in the accounts were intended for diplomatic and consular purposes so there was no applicable FSIA exception; and (4) one of the accounts was in the custody of the Office of Foreign Missions pursuant to the

---

[4] Under the Foreign Missions Act, the U.S. Secretary of State may preserve and protect the property of a foreign mission when that mission has ceased conducting diplomatic, consular, and other governmental activities in the United States.  22 U.S.C. § 4305(c).

Foreign Missions Act (which prohibits attachment). (U.S. Mem. Supp. Mot. to Quash at 1-10.)[5]

Thus, with regard to the FSIA, the U.S. Government simply argued that Section 1610's

commercial activity exception depends on the actions of the foreign state and would not apply to

monies designated for diplomatic and consular purposes. (U.S. Mem. Supp. Mot. to Quash at

18-19.) Given the numerous considerations involved in *Cicippio*, and the very narrow arguments

concerning the FSIA, the Court does not consider the U.S. Government's position in *Cicippio* to

be evidence that the Executive Branch has consistently intervened and argued that property

belonging to a foreign state should be exempt from execution under Section 1609 of the FSIA.

Significantly, on July 28, 2004, the U.S. Government filed a statement of interest in this

case. In its statement of interest, the U.S. Government does not challenge the propriety of

attaching property belonging to a foreign sovereign nor discuss the issue of standing. Rather, the

U.S. Government simply argues that the Persepolis and Chogha Mish collections are not blocked

assets under the Terrorism Risk Insurance Act of 2002 and that Citation Respondents' activities

are not relevant to a commercial activity analysis under Section 1610(a) of the FSIA. (U.S.

Statement of Interest at 11-12.) The U.S. Government's interpretation of Section 1610(a)'s

commercial activity exception does not shed any light on the Executive Branch's approach to

standing under Section 1609 or 1610 nor reveal a strong desire to invoke immunity from

attachment whenever possible. Accordingly, the Court is not persuaded by Citation Respondents'

representations of the desires of the Executive Branch of the U.S. Government.

---

[5] A copy of the U.S. Government's brief, entitled "Memorandum of Points and
Authorities in Support of Motion to Quash Plaintiffs' Writs of Attachment Delivered to Bank of
America," is attached as Exhibit 1 to the Field Museum's Memorandum of Law in Support of its
Motion for Protective Order.

- 18 -

### b.   Legislative history and purpose of the FSIA

Citation Respondents argue that the legislative history and the purpose of the FSIA disfavor attachment of the property of foreign states and support granting third parties standing to raise Section 1609 immunity defenses. Specifically, Citation Respondents claim third parties should be granted standing to raise Section 1609 defenses because: (1) Congress views attachment of the property of a foreign state to be an affront to that state; and (2) the FSIA not only codified the restrictive theory of foreign sovereign immunity but intentionally made it more difficult for plaintiffs to overcome foreign sovereign immunity under Section 1609 (attachment) than under Section 1604 (jurisdiction).  (Field Br. at 9-10; Univ. Chicago Br. at 4-7.)

Citation Respondents cite to House Report, H.R. Rep. No. 94-1487, 9th Cong. 2nd Sess., at 27 (1976), and argue that Congress placed severe restrictions on litigants' ability to attach property of a foreign state because such attachments are a "significant irritation" and cause "serious friction in United States' foreign relations." (Field Br. at 9.)  While attachment may very well cause friction in foreign relations, the passage relied upon by Citation Respondents explicitly refers to "[a]ttachment for jurisdictional purposes [which] . . . involv[e] U.S. courts in litigation not involving any significant United States interest or jurisdictional contacts, apart from the fortuitous presence of property in the jurisdiction." H.R. Rep. No. 94-1487, at 26.  The House Report continues:

> Claimants will clearly benefit from the expanded methods under the bill for service on a foreign state (sec. 1608), as well as from the certainty that section 1330(b) of the bill confers personal jurisdiction over a foreign state in Federal and State courts as to every claim for which the foreign state is not entitled to immunity.  The elimination of attachment as a vehicle for commencing a lawsuit will ease the conduct of foreign relations by the United States and help eliminate

the necessity for determinations of claims of sovereign immunity by the State
Department.

Id. at 27. Thus, under the FSIA, plaintiffs may not attach property of a foreign state as a vehicle

to establish jurisdiction but instead must wait to attach property of a foreign state until

jurisdiction is established under Section 1604, the foreign state has been found liable, and the

foreign state has received proper notice of attachment proceedings per Section 1608. At that

point, the foreign state may very easily exercise all of its rights under the FSIA simply by

appearing and requesting Section 1609 immunity from attachment. Iran, in particular, is an

experienced litigant in the United States federal court system and should have no difficulty

invoking all of its rights under the FSIA. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1,

6 n.1 (D.D.C. 1998) ("Iran is an experienced litigant in the United States federal court system

generally and in this Circuit."). *See also Ministry of Defense and Support for Armed Forces of*

*Islamic Republic of Iran v. Cubic Defense Sys.*, 385 F.3d 1206, 1210 (9th Cir. 2004) (Iran filed

petitions, motions, and appeals); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 230

(D.C. Cir. 2003) ("Iran chose not to defend its action in this Court, despite its long history of

adjudicating claims in this Circuit."); *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 165

(D.C. Cir. 1994) (Iran filed motion to dismiss); *Foremost-McKesson v. Islamic Republic of Iran*,

905 F.2d 438, 440-41 (D.C. Cir. 1990) (Iran filed motion to dismiss and an appeal); *Berkovitz v.*

*Islamic Republic of Iran*, 735 F.2d 329, 330-31 (9th Cir. 1984) (Iran filed motion to dismiss).

Given all of the procedural safeguards and the extensive rights granted to foreign

sovereigns, the Court is not convinced that FSIA attachment proceedings after a judgment has

been entered are necessarily a significant irritation to foreign states. The FSIA goes a long way

toward promoting harmonious international relations by protecting the rights and properties of
foreign states so there is no need for this Court to create new rights under the FSIA for
third-party interveners, such as Citation Respondents here. Creating new rights in this case is
particularly unnecessary, as Iran is clearly capable and willing to assert immunity defenses when
it so desires.

Next, Citation Respondents incorrectly assert that the FSIA intentionally made it more
difficult for litigants to overcome foreign sovereign immunity under Section 1609 than under
Section 1604. Prior to 1952, the U.S. Government generally afforded foreign sovereigns
absolute immunity from the jurisdiction of the courts, including complete immunity from
execution. *Verlinden*, 461 U.S. at 486; *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d
240, 251 (5th Cir. 2002). In 1952, by way of the "Tate Letter,"[6] the U.S. State Department
announced its adoption of the restrictive theory of foreign sovereign immunity. *Verlinden*, 461
U.S. at 486-87. Under the restrictive theory, foreign sovereign immunity is confined to suits
involving the foreign state's public acts, and does not extend to cases arising out of a foreign
state's strictly commercial acts. *Id.* at 487. Even after adopting the restrictive theory, however,
the U.S. Government did not modify the complete immunity enjoyed by foreign sovereigns from
execution against their property. *Id.* In short, if a plaintiff successfully obtained a final judgment
against a foreign state, he still had to rely on the foreign state to pay the judgment voluntarily.
*Conn. Bank of Commerce*, 309 F.3d at 252 (citing H.R. Rep. No. 94-1487, at 8, 27, and

---

[6] Letter from Jack B. Tate, Acting Legal Adviser, Department of State, to Acting
Attorney General Philip B. Perlman (May 19, 1952), reprinted in 26 Dep't of State Bull. 984-985
(1952), and in *Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 711 (1976) (Appendix 2 to
opinion of White, J.).

-21-

Restatement (Third) of the Foreign Relations Law of the United States § 460 cmt. a (1987)). The

FSIA, enacted in 1976, essentially codified the restrictive theory of sovereign immunity as

described in the Tate Letter, but also modified the rule barring execution against a foreign state's

property by "partially lowering the barrier of immunity from execution," H.R. Rep. No. 94-1487,

at 27, and making it more difficult for foreign states to invoke immunity from attachment than

immunity from jurisdiction. *See De Letelier v. Republic of Chile*, 748 F.2d 790, 798-99 (2d Cir.

1984). For both immunity from jurisdiction and immunity from attachment, commercial activity

generally constitutes the touchstone of the immunity determination. But immunity from

execution is nevertheless narrower than jurisdictional immunity. *See Conn. Bank of Commerce*,

309 F.3d at 252; *De Letelier*, 748 F.2d at 798-99. Thus, the FSIA made it easier, not harder, for

plaintiffs to attach property in the United States of a foreign state.

Because it is not abhorrent to apply the traditional rules of affirmative defenses to the

FSIA and because there are no strong policy reasons to grant Citation Respondents standing to

invoke Iran's Section 1609 immunity claims, the Court is not tempted to create new rights under

the FSIA for third parties, such as Citation Respondents.

### C.  Citation Respondents May Not Invoke Iran's Section 1609 Immunity Claims by Proxy.

Citation Respondents claim that even if they lack standing under the FSIA they have

standing to raise Iran's immunity defenses by proxy under *Powers v. Ohio*, 499 U.S. 400, 410-11

(1991). (Univ. Chicago Br. at 10.) As a general rule, a litigant must assert his own legal rights

and cannot assert the legal rights of a third party. *Powers*, 499 U.S. at 410; *In re*

- 22 -

*African-American Slave Descendants Litigation,* 375 F. Supp. 2d 721, 753 (N.D. Ill. 2005). In

*Powers,* the Supreme Court found that a litigant may assert the rights of an absent third party in

some limited circumstances. *Powers,* 499 U.S. at 410-11. To determine whether a litigant has

standing to assert the rights of an absent third party, the Court applies a two part test. First the

litigant must have suffered an "injury in fact." *Id.* at 411. Second, certain prudential

considerations must point in favor of permitting the litigant to assert the third party's rights. *Id.*;

*In re African-American Slave Descendants Litigation,* 375 F. Supp. 2d at 753. Such

considerations include the requirement that the litigant have a close relationship with the third

party, and that there exists a hindrance to the third party's ability to protect its own rights.

*Powers,* 499 U.S. at 411; *In re African-American Slave Descendants Litigation,* 375 F. Supp. 2d

at 753-54. Citation Respondents claim that they have standing to assert Iran's rights in this case

because: (1) they will suffer an injury in fact; (2) they are close to Iran; and (3) Iran is unable to

protect its own rights. (Univ. Chicago Br. at 10-12.)

     First, Citation Respondents contend that they will suffer an injury in fact if Plaintiffs are

permitted to execute on and attach the Persian collections currently in Citation Respondents'

possession. The specific injuries identified by Citation Respondents include: (1) the inability to

complete scholarly studies that they are currently conducting; and (2) the undermining of their

credibility when it comes to safeguarding and housing other collections or exhibits in the future.

(Univ. Chicago Br. at 11.) Citation Respondents identify reasons why they have an interest in

Plaintiffs' attempts to attach the Persian collections but fail to identify injuries in fact. Citation

Respondents' claims are especially weak given that: (1) the Chogha Mish and Persepolis

collections that Plaintiffs seek to attach were loaned to Citation Respondents and are currently

packaged and awaiting shipment back to Iran; and (2) attachments of any of the collections

would, of course, be subject to any possessory rights that Citation Respondents may have.

Furthermore, if the laws of the United States do not permit Citation Respondents to make certain

arguments on behalf of foreign states, Citation Respondents' fear of losing credibility when they

are barred from making those arguments can be a legitimate concern of Congress but not of the

Court.

Next, Citation Respondents argue that they maintain a close relationship with Iran and are

capable of arguing effectively on Iran's behalf. (Univ. Chicago Br. at 11.) Regardless of whether

Citation Respondents are capable of arguing effectively on Iran's behalf, Citation Respondents

are not sufficiently close to Iran to satisfy the second prong of the *Powers* test. Even if Citation

Respondents have maintained a working relationship with Iran over the last seventy years, the

Citation Respondents' incentives for enforcing foreign sovereign immunity against attachment do

not suggest that the parties are that closely aligned. *See Singleton v. Wulff*, 428 U.S. 106, 115

(1976). Even more importantly, Citation Respondents are not Iran's representatives in the United

States and are not invested with any authority to represent Iran.

Finally, under the *Powers* test, Citation Respondents must demonstrate that there exists a

hindrance to Iran's ability to protect its own rights. *Powers*, 499 U.S. at 410-11; *In re*

*African-American Slave Descendants Litigation*, 375 F. Supp. 2d at 753-54. Citation

Respondents do not identify a specific hindrance to Iran's ability to protect its own rights but

claim that any number of legitimate reasons might keep Iran from asserting its rights in this case

and "[i]t is not necessary to speculate as to the reasons behind Iran's non-appearance . . . ."

(Univ. Chicago Br. at 12.) The Court agrees that legitimate reasons might keep Iran from

- 24 -

asserting its own rights but notes that there are no legal barriers that Iran must overcome in order to appear in this case. In fact, Iran is perfectly capable of raising its foreign sovereign immunity rights in U.S. courts when it so chooses. *See Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran*, 385 F.3d at 1210; *Flatow*, 999 F. Supp. at 6 n.1; *Roeder*, 333 F.3d at 230; *Cicippio*, 30 F.3d at 165; *Foremost-McKesson*, 905 F.2d at 440-41; *Berkovitz*, 735 F.2d at 330-31. Furthermore, Iran is currently defending itself in attachment proceedings related to this case in Belgium, (Pls.' Notice of Related Proceeding at Exs. A and B), and Iran is currently fighting the sale of antiquities originating in Persepolis in England. (Pls.' Supp. Notice of Related Proceeding at Ex. A.) Thus, it appears that Iran is capable of asserting its rights when it pleases and the Court will not simply gloss over this part of the *Powers* test. *See U.S. v. Holm*, 326 F.3d 872, 876 (7th Cir. 2003) (barring claim by third party where there is no barrier preventing first party from filing claim); *Massey v. Wheeler*, 221 F.3d 1030, 1035 (7th Cir. 2000) (denying standing to third party litigant where no obstacle prevents first party from asserting his rights and first party "seems quite expert" at bringing his own cases).

Citation Respondents fail to meet any of the requirements under *Powers* and therefore lack standing to raise claims as a proxy on behalf of Iran. It follows that only Iran may raise its affirmative defenses in opposition to attachment.

## IV. Conclusion

For the reasons stated above, the Court finds that, as a matter of law, no party other than Iran may assert Iran's foreign sovereign immunity defenses under Sections 1609 and 1610 of the FSIA. Accordingly, Plaintiffs' motion for partial summary judgment is granted. The parties shall

appear before this Court for a status hearing regarding their remaining outstanding discovery

motions at 10 a.m. on January 19, 2006.

### ENTER ORDER:

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: December 15, 2005.

- 26 -

Copies have been mailed to:

DAVID J. STRACHMAN, Esq.
ROBERT S. PARKER, Esq.
McIntyre, Tate, Lynch & Holt
321 South Main Street
Suite 400
Providence, RI  02903

ROBERT D. CHEIFETZ, Esq.
DANIEL A. SHMIKLER, Esq.
Sperling & Slater, P.C.
55 West Monroe Street
Suite 3200
Chicago, IL  60603

THOMAS A. DOYLE, Esq.
MATTHEW G. ALLISON, Esq.
Baker & McKenzie, L.L.P.
One Prudential Plaza
Suite 3500
130 East Randolph Drive
Chicago, IL  60601

LAWRENCE W. NEWMAN, Esq.
JACOB M. KAPLAN, Esq.
Baker & McKenzie, L.L.P.
805 Third Avenue
New York, NY  10022

R. CLAY BENNETT, Esq.
THOMAS J. CUNNINGHAM, Esq.
Lord, Bissell & Brook, L.L.P.
115 South LaSalle Street
Chicago, IL  60603

Attorneys for Plaintiffs

Attorneys for Citation Third Party
  Respondents

# EXHIBIT "F"

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JENNY RUBIN, et al.,                              )
                                                  )
                  Plaintiffs,    )
                                                  )
v.                                                )
                                                  )   No. 03 CV 9370
THE ISLAMIC REPUBLIC OF IRAN, et al.,             )   Judge Blanche M. Manning
                                                  )
                  Defendants,    )   Magistrate Judge Martin C. Ashman
                                                  )
v.                                                )
                                                  )
THE UNIVERSITY OF CHICAGO, et al.                 )
                                                  )
      Citation Third Party Respondents.           )

### MEMORANDUM AND ORDER

Displeased with Magistrate Judge Ashman's report and recommendation on the plaintiffs' motion for partial summary judgment, citation respondents the University of Chicago, the Field Museum of Natural History, and Gil Stein have objected. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Specifically, the citation respondents contend that the magistrate judge misapprehended federal statutes, and cases interpreting them, when concluding that only defendant Iran may assert foreign sovereign immunity over its property located in the United States. However, because the magistrate's report is well-reasoned and correctly interprets laws governing foreign sovereign immunity, the citations respondents' objections are overruled.

### *Background*

In 2001, the plaintiffs obtained a federal court judgment in a personal injury suit against Iran and several other defendants. The plaintiffs are now attempting to enforce their judgment by seeking to execute or attach various collections of Persian artifacts in the possession of the

F

citation respondents. *See* Foreign Sovereign Immunity Act, 28 U.S.C. § 1602 *et seq.* (the FSIA).

Iran loaned the artifacts to the citation respondents in the 1930s and 1960s with the

understanding that the collections would be returned after archeological studies were completed.

The FSIA governs attempts to sue foreign governments, or to seek to execute or attach

property located in the United States that is owned by a foreign government. *See* 28 U.S.C.

§ 1602 *et seq.* For the most part, property owned by a foreign state is immune from attachment.

*See id.* at § 1609 ("the property in the United States of a foreign state shall be immune from

attachment arrest and execution"). However, the statute creates two exceptions. Section 1610

creates an exception for property used by the foreign state for a commercial activity. Although

during a different stage of this litigation the parties disagreed over whether the commercial

activity exception of § 1610 applied, the exception's applicability is not relevant to the motion

for partial summary judgment. Neither is the exception created by § 1611, which prohibits the

attachment of certain property owned by foreign banks or foreign militaries.

Iran has so far failed to assert its sovereign immunity or even to appear, despite having

been given notice of these proceedings. In its absence, the citation respondents have asserted

Iran's foreign sovereign immunity under the FSIA to resist the plaintiffs' attempts to execute or

attach the Persian artifacts. The plaintiffs responded by filing the instant motion seeking to

establish that, as a matter of law, no party other than Iran may assert Iran's sovereign immunity

under the FSIA.

The magistrate judge recommended granting the plaintiffs' motion for partial summary

judgment. In his report and recommendation, Magistrate Judge Ashman concluded that foreign

sovereign immunity is an affirmative defense personal to Iran, and therefore only Iran has

standing to assert the defense. In reaching that conclusion, the magistrate judge rejected the

citation defendants' argument that foreign sovereign immunity is not an affirmative defense, but

rather is a question of subject matter jurisdiction that can be raised by any party at any time. The

magistrate judge also rejected the argument by the citation respondents that the plaintiffs should

have raised their standing argument at the same time they filed earlier discovery motions raising

arguments under the FSIA. The magistrate judge concluded that the motion was timely because

the parties were still in the early stages of litigation.

### Analysis

#### Standard of Review

The magistrate judge issued his report and recommendation under the authority granted

by 28 U.S.C. § 636(b)(1). As permitted by that statute, the defendants objected. Accordingly,

this court reviews the magistrate judge's report and recommendation *de novo*. *See* 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72(b); *Pinkston v. Madry*, 440 F.3d 879, 893 (7th Cir. 2006).

Normally, in reviewing a motion for summary judgment, the court would decide whether a

genuine issue of material fact precluded judgment as a matter of law for the moving party. *See*

Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). However, the question

presented by the plaintiffs' motion is a purely legal one: may Iran's sovereign immunity under

the FSIA be asserted only by Iran?

#### Timeliness of Motion for Partial Summary Judgment

As a threshold matter, the court agrees with the magistrate judge's conclusion that the

plaintiffs' motion for partial summary judgment was timely. As the magistrate judge noted, apart

from the instant motion, the parties have litigated only a few discovery matters. The citation respondents barely address why they believe the magistrate judge's report and recommendation is wrong on this point other than to conclusorily assert that it is. *See Weinstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005) (perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are forfeited). Accordingly, they have failed to provide this court with a reason for not accepting the magistrate judge's conclusion.

### *Foreign Sovereign Immunity is an Affirmative Defense*

After carefully reviewing the magistrate's report and recommendation, the briefs filed by the parties and the United States, the cases cited, and the FSIA, the court agrees with the magistrate judge's conclusion that foreign sovereign immunity under § 1610 is an affirmative defense. As stated explicitly in a United States House report prepared at the time of the FSIA's passage, foreign sovereign immunity was enacted by Congress as "an affirmative defense which must be specially pleaded." H.R. Rep. No. 94-1487, 9th Cong., 2d Sess., at 17 (1976). Although the quoted language referred to immunity from suit afforded foreign states by § 1604, elsewhere the House Report likens immunity from suit under § 1604 to the immunity that shields a foreign state's property from attachment or execution under § 1609. H.R. Rep. No. 94-1487, at 26 ("As in the case of section 1604 of the bill with respect to jurisdiction, section 1609 states a general proposition that the property of a foreign state, as defined in section 1603(a), is immune from attachment and from execution . . . .")

The citation respondents urge the court not to consider or rely upon the legislative history of the FSIA for two reasons. First, they argue that the court must not turn to legislative history to interpret the statute because the statute's meaning is clear on its face. Specifically, the citation

Page 4

respondents contend that § 1609's use of the language "*the property* in the United States of a foreign state *shall be immune* from attachment" (emphasis added) unambiguously means that immunity runs with the foreign state's property, regardless of whether the foreign state asserts immunity. In other words, the citation respondents argue, use of the word "shall" makes immunity automatic, and in the absence of one of the exceptions in §§ 1610 or 1611, a district court is without jurisdiction to attach such property. According to the citation respondents, to read into the statute a requirement that the foreign state assert immunity "interpose[s] additional requirements beyond the statute's declaration of immunity."

But § 1609's use of the word "shall" is not as unambiguous as portrayed by the citation respondents. Just a few sections earlier within the same statute, the FSIA creates a ten-year statute of limitations with the language "[n]o action *shall be maintained* under subsection (a)(7) unless the action is commenced not later than 10 years after the day on which the cause of action arose." 28 U.S.C. § 1605(f). Yet despite use of the word "shall," according to Federal Rule of Civil Procedure 8(c), statutes of limitations such as the one created by § 1605(f) are affirmative defenses which, if not asserted, could lead to forfeiture. *See Carter v. United States*, 333 F.3d 791, 796 (7th Cir. 2003) (failure to assert an affirmative defense will result in waiver if plaintiff is prejudiced by the delay). Use of the word "shall" to create an affirmative defense is not unique to the FSIA—many other instances occur throughout the United States Code. *See, e.g.*, 15 U.S.C. § 1711(a) (statute of limitations); 18 U.S.C. § 2332(a) (statute of limitations); 45 U.S.C. § 56 (statute of limitations).

Second, the citation respondents contend that despite language in House Report 94-1487 describing foreign sovereign immunity as an affirmative defense, the Supreme Court nevertheless

directed district courts to assess immunity *sua sponte* in *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983). In *Verlinden*, the Supreme Court concluded that "sovereign immunity is an affirmative defense that must be specially pleaded," *id.* at 494 n.20, but that a district court must still determine whether immunity is available under the FSIA "even if the foreign state does not enter an appearance to assert an immunity defense." *Id.* at 494 n.20.

The citation respondents seize upon this discussion in *Verlinden* to argue that the magistrate judge erred by granting plaintiffs' motion for partial summary judgment without evaluating *sua sponte* whether Iran's property was immune. But the argument is misinformed. As the Supreme Court explained in *Verlinden*, the district court's responsibility to evaluate immunity *sua sponte* is rooted not in the FSIA, but rather in 28 U.S.C. § 1330(a). Under § 1330(a), federal courts have jurisdiction over actions against foreign states only if "the foreign state is not entitled to immunity either under sections 1605-07 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a). Thus, *Verlinden* is inapposite for two reasons. First, the obligation to evaluate immunity *sua sponte* is created by § 1330(a), not by the FSIA. Second, the immunity that must be evaluated under § 1330(a) is immunity afforded the foreign state itself under § 1604, not afforded its property under § 1609, the only immunity at issue in this case.

Finally, although not a party, the United States has weighed in with its interpretation of the FSIA by filing a statement of interest. In it, the United States argues that the magistrate judge erred by basing his decision upon affirmative defense jurisprudence because, according to the government, immunity from attachment under § 1609 is an affirmative defense, but not "an affirmative defense of the sort the Magistrate Judge assumed." According to the government's

Page 6

argument, "true" affirmative defenses may be asserted only in responsive pleadings. *See* Fed. R. Civ. P. 8(c) ("In pleading to a preceding pleading, a party shall set forth" its affirmative defenses.) In a proceeding such as this where judgment creditors seek to execute their judgment under Federal Rule of Civil Procedure 69, there are no pleadings. Therefore, the government argues, foreign sovereign immunity under § 1609 cannot be a "true" affirmative defense, but rather must arise "presumptively." Accordingly, the government contends, "Iran's presence should not have been found necessary to judicial review of that presumption."

The court does not find the government's argument to be well-reasoned. First, the government relegates the argument to a footnote, and the argument was not even raised by the citation respondents. Courts have previously held that such arguments are forfeited. *See Weinstein*, 422 F.3d at 477 n.1 (perfunctory and undeveloped arguments are forfeited); *Williams v. General Electric Capital Auto Lease, Inc.*, 159 F.3d 266, 274 (7th Cir. 1998) (argument that appeared only in footnote was undeveloped and, therefore, forfeited).

Second, the government offers nothing to support the distinction it attempts to create between run-of-the-mill affirmative defenses, and the affirmative defense of foreign sovereign immunity created by § 1609, a "sort" of defense that the government contends is actually a presumption. The two Seventh Circuit cases it cites for the proposition that immunity attaches presumptively under the FSIA in fact state nothing of the sort. In *Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005), the court held that the "party claiming FSIA immunity *bears the initial burden of proof* of establishing a prima facie case that it satisfied the FSIA's definition of a foreign state." *Id.* at 882 (emphasis added); *see also Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, 293 F.3d 392, 397 (7th Cir. 2002) ("The party claiming immunity under this section

Page 7

must establish a prima facie case that it is a foreign instrumentality.") Given that the party

asserting immunity bears the initial burden of establishing that immunity is available, immunity

cannot, at the same time, arise presumptively. *See Enahoro*, 408 F.3d at 882; *Caja Nacional*,

293 F.3d at 397.

Finally, the government's theory leads to the absurd conclusion that affirmative defenses

can never be raised in execution proceedings. Such a conclusion necessarily follows the

government's argument that affirmative defenses may be asserted only in response to pleadings,

even though there are no pleadings in execution proceedings under Rule 69. However, the

government's contention that affirmative defenses may not be raised in execution proceedings is

simply not true. *See, e.g., Jalapeno Property Mgt., LLC v. Dukas*, 265 F.3d 506, 513-14 (6th Cir.

2001) (statute of limitations raised by defendants against plaintiff's attempt to execute judgment,

though appellate court reversed because district court improperly calculated limitations period).

### *The Affirmative Defense of Immunity May Be Asserted Only By Iran*

The court agrees not only with the magistrate judge's determination that foreign

sovereign immunity under § 1609 is an affirmative defense that must be asserted, but also with

the conclusion that the defense may be asserted only by the foreign sovereign. Generally

speaking, one party's ability to assert the rights of an absent party are limited. In *Powers v. Ohio,*

499 U.S. 400 (1991), the Supreme Court set forth the two-part test that determines whether one

party may assert the rights of an absent party. First, the litigant must have suffered an "injury in

fact." *Id.* at 411. Second, prudential considerations must favor permitting the litigant to assert

the other party's rights. *Id.* These considerations include how close the litigant's relationship is

to the missing party, and whether a hindrance has prevented the missing party from asserting its rights itself. *Id.*

The citation respondents contend that the magistrate judge incorrectly applied the test set forth in *Powers* to the facts of this case in three ways. First, they argue that the magistrate judge incorrectly concluded that they will not suffer an injury in fact based upon the facts that (1) the Persian collections are currently packaged and awaiting shipment back to Iran; and (2) attachment would be subject to any possessory rights the citation respondents have. Although the citation respondents disagree with the magistrate judge, they do so only conclusory: "he [the magistrate judge] fails to appreciate the factual context in which this dispute takes place, thus causing him to deny that Respondents will suffer a very real injury." By failing to identify any facts the magistrate judge failed to "appreciate," the citation respondents give this court no reason to decline to adopt the magistrate judge's conclusions. *Weinstein*, 422 F.3d at 477 n.1 (undeveloped arguments are forfeited).

The citation respondents also take issue with the magistrate judge's conclusion that prudential considerations do not favor permitting the respondents to assert Iran's immunity. The two concerns they identify are (1) how closely aligned they are with Iran; and (2) Iran's ability to assert its own rights in this case. The court considers each concern in turn.

First, the citation respondents contend that the magistrate judge improperly concluded that they are not closely aligned with Iran by relying on *Singleton v. Wulff*, 428 U.S. 106 (1976). The citation respondents appear to argue that *Singleton* is inapposite because they are in possession of Iran's property, as though under *Singleton* the alignment of parties' interests turns on whether one possesses property of the other. In fact, the magistrate judge relied on *Singleton*

Page 9

simply for the general proposition that parties' interests must be aligned—*Singleton* does not concern possession of property, nor did the magistrate judge imply that it did. The citation respondents also argue that, as bailees, they are obligated under Illinois law to protect Iran's property. Although the citation respondents cite Illinois bailment law, they have failed to cite any case establishing that state bailment law overrides a plaintiff's right to attach property in accordance with the FSIA. Nor is the court aware of any such precedent.

Next, the citation respondents argue that the magistrate judge incorrectly concluded that Iran has not been impeded from asserting its own right to foreign sovereign immunity under § 1609. Under *Powers*, determining whether a foreign sovereign has been impeded from asserting immunity depends upon the existence of "considerable practical barriers to suit" as well as the "incentive to set in motion the arduous process needed to vindicate [the foreign sovereign's] own rights." *Powers* 499 U.S. at 415.

The magistrate judge's conclusion was based primarily on Iran's long history of asserting its foreign sovereign immunity in United States' courts when it so chooses. *See, e.g., Ministry of Defense & Support for Armed Forces of Islamic Republic of Iran v. Cubic Defense Sys.*, 385 F.3d 1206, 1210 (9th Cir. 2004); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 230 (D.C. Cir. 2003); *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 165 (D.C. Cir. 1994); *Foremost-McKesson v. Islamic Republic of Iran*, 905 F.2d 438, 440-41 (D.C. Cir. 1990); *Berkovitz v. Islamic Republic of Iran*, 735 F.2d 329, 330-31 (9th Cir. 1984); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 6 n.1 (D.D.C. 1998). The citation respondents argue that the magistrate judge erred by not also taking into account the "negative treatment Iran has received in U.S. courts," which according to the citation respondents "diminishes Iran's 'incentive to set in

Page 10

motion the arduous process needed to vindicate [its] rights.'" Citation Respondents' Objections
at 14 (citing *Powers*, 499 U.S. at 415). The citation respondents' brazen accusation that the
courts of the United States are hostile to Iran and that, as a result, Iran should be excused from
bothering to assert its rights, is wholly unsupported.

The citation respondents also contend that the long list of cases cited above in which Iran
defended itself "demonstrates that Iran faces numerous 'practical barriers' to suit in the form of
extensive defense costs," citing *Powers* as support. Yet the barrier in *Powers* was far more
onerous than whatever barrier Iran faces. In *Powers*, a criminal defendant was permitted to assert
the equal protection claim of seven jurors allegedly dismissed because of their race. *Powers*, 499
U.S. at 403-04. The Supreme Court's decision was based, in part, on the fact that any attempt by
an excluded juror to sue would be "daunting." *Id.* at 415. Specifically, the court found that
"because of the small financial stake involved and the economic burdens of litigation," an
excluded juror would have "little incentive to set in motion the arduous process needed to
vindicate his own rights." *Id.*

The burdens Iran would have faced in this suit would have been inconsequential
compared to the burdens described in *Powers*. Iran only needed to assert its immunity in order to
protect its rights, as opposed to jurors in *Powers* who would have had to draft a complaint and
file suit, engage in discovery and motion practice, proceed to trial and eventually obtain a
judgment. To the extent Iran would have incurred fees and costs to defend itself, the citation
respondents have made no effort to establish that Iran's defense costs would have been any more
burdensome than the costs any defendant to multiple suits faces. Furthermore, the jurors in

Page 11

*Powers* stood to gain little financially, while Iran stands to retain what appears to be a coveted and irreplaceable collection of artifacts.

Finally, the citation respondents contend that, under their interpretation. § 1610(c) of the FSIA implies that third parties may assert immunity over a foreign sovereign's property. Section 1610(a) and (b) create exceptions to immunity, while (c) requires that, in the event the foreign state has defaulted, adequate notice be given the defaulting foreign state before the exceptions to immunity may be employed. According to the citation respondents, given that (1) § 1610's discussion of exceptions to immunity is relevant only if immunity has been asserted, and (2) immunity could not have been asserted by a foreign state if the foreign state defaulted, the statute must contemplate that immunity was asserted by a third-party.

The court does not disagree with the citation respondent's argument that § 1610(c) operates in the event that a third-party has asserted a foreign state's immunity. However, it does not follow that the citation respondents, as third-parties, are entitled to assert Iran's immunity. As discussed above, only third-parties that meet the factors set forth in *Powers* may assert the foreign state's immunity, and the citation respondents do not meet the *Powers* factors.

Accordingly, the court agrees with the magistrate judge's conclusion that, under the test set forth in *Powers*, the citation respondents are not entitled to assert Iran's foreign sovereign immunity under 28 U.S.C. § 1609.

### Policy Considerations & Executive Branch Concerns

The citation respondents and the government devote considerable effort to describing various adverse effects that will result unless the magistrate judge's report and recommendation is rejected. For instance, they fear that if the plaintiffs are allowed to attach Iran's property, other

countries will never again lend artifacts to institutions within the United States, that other countries will seize U.S. properties within their borders, and that the relationship between the United States and other countries will be strained.

The court is sympathetic to citation respondents' and government's fears. However, the court is charged with interpreting and applying federal statutes as enacted. As enacted by Congress, the FSIA creates an affirmative defense of foreign sovereign immunity that must be asserted by the foreign state. Even if the court were to agree with the citation respondents and government that international relations would be better served if foreign sovereign immunity were presumed even if not asserted, the court would not be free to ignore the immunity scheme that Congress developed. If the citation respondents and government believe that changes should be made to the FSIA, then they must petition Congress to amend it, not ask the court to ignore it.

### Conclusion

In sum, the court adopts the magistrate judge's conclusions in his report and recommendation that (1) foreign sovereign immunity under 28 U.S.C. § 1609 is an affirmative defense that must be asserted; and that (2) the citation respondents are not entitled to assert immunity on Iran's behalf. Therefore, the citation respondents' objection to the magistrate judge's report and recommendation is OVERRULED.


ENTER:

DATE:        June 22, 2006            _Blanche M. Manning_
                                        Blanche M. Manning
                                        U.S. District Court Judge


Page 13

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RECEIVED
MAY 1 3 2008
JUDGE ROBERT W. GETTLEMAN
UNITED STATES DISTRICT COURT

DEBORAH D. PETERSON, Personal )
Representatives of the Estate of James C. )
Knipple (Dec.), et. al., )
                                    )
      Plaintiffs-Judgment Creditors, )
                                      )
vs.                             )
                                      )
ISLAMIC REPUBLIC OF IRAN, et al., )
                                      )
      Defendants-Judgment Debtors. )
                                      )

Case No.: 108-CV-01592

Judge Robert Gettleman
Magistrate Judge Ashman

FILED

MAY 1 3 2008

Judge Robert W. Gettleman
United States District Court

## SERVICE LIST FOR MOTION FOR APPOINTMENT OF RECEIVER

*Via Email dr-ahmadinejad@president.ir*
PRESIDENT DR. AHMADINEJAD

ISLAMIC REPUBLIC OF IRAN
acting through its
MINISTRY OF DEFENSE AND
SUPPORT FOR ARMED FORCES
No. 1 Shahid Kaboli Street
Beginning of Resalat Highway
Seyyed Khandan Bridge
P.O. Box 16765-1479
Tehran, Iran
Attn: Responsible Officer

ISLAMIC REPUBLIC OF IRAN
Pasadaran Avenue
Golestan Yekom
Teheran, Iran
ATTN: Responsible Officer

ISLAMIC REPUBLIC OF IRAN
Khomeini Avenue
United Nations Street
Teheran, Iran
ATTN: Responsible Officer

AUSA
United States Attorney's Office (NDIL)
219 South Dearborn Street , Suite 500
Chicago, IL 60604

Matthew G. Allison
Baker & McKenzie LLP (Chicago)
One Prudential Plaza
130 East Randolph Drive, Suite 3500
Chicago, IL 60601

R. Clay Bennett
Locke Lord Bissell & Liddell LLP
111 South Wacker Drive

1

Chicago, IL 60606

Rupa Bhattacharyya
United States Department of Justice
Federal Programs Branch
PO Box 883
901 East Street, N.W., Room 910
Washington, DC 20044

Robert David Cheifetz
Sperling & Slater
55 West Monroe Street, Suite 3200
Chicago, IL 60603

Thomas G. Corcoran
Berliner Corcoran & Rowe, LLP
1101 17th Avenue
Washington, DC 20036-5555

Thomas Justin Cunningham
Locke Lord Bissell & Liddell LLP
111 South Wacker Drive
Chicago, IL 60606

Thomas Anthony Doyle
Baker & McKenzie LLP (Chicago)
One Prudential Plaza
130 East Randolph Drive, Suite 3500
Chicago, IL 60601

Lesley R. Farby
U.S. Dept. of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530

Simon A. Fleischmann
Locke Lord Bissell & Liddell LLP
111 South Wacker Drive
Chicago, IL 60606

Richard M. Franklin
Baker & McKenzie
130 East Randolph Drive, Suite 3200

Chicago, IL 60601

Kevin David Kelly
Locke Lord Bissell & Liddell LLP
111 South Wacker Drive
Chicago, IL 60606

Hillary Paige Krantz
Freeborn & Peters, LLP
311 South Wacker Drive, Suite 3000
Chicago, IL 60606

Michael D. McCormick
708 Tomlin Drive, Suite 1800
Burr Ridge, IL 60527

Timothy M Murphy
Timothy M. Murphy, P.C.
4436 North Kildare Avenue
Chicago, IL 60630

Robert S. Parker
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903

Daniel A. Shmikler
Sperling & Slater
55 West Monroe Street, Suite 3200
Chicago, IL 60603

David J. Strachman
McIntyre, Tate, Lynch & Holt
321 South Main St., #400
Providence, RI 02903
United States Attorney's Office
219 South Dearborn
Chicago, IL 60604

Laina C. Wilk
Berliner, Corcoran & Rowe, LLP
1101 17th Street, NW
Washington, DC 20036

2

Renee Helen Wiszowaty
Litchfield Cavo
303 West Madison Street, Suite 300
Chicago, IL 60606


F:\USERS\DJCNEW\petersonappoint3pos.doc